UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| SANDRA AVILA, *et al*, § <br> § <br> Plaintiffs, § <br> VS. § <br> § <br> A HEALTHY LIVING HOME HEALTH § <br> INC., *et al*, § <br> § <br> Defendants. § | CIVIL ACTION NO. 7:14-CV-00982 |

## OPINION & ORDER

The Court now considers Sandra Avila ("Avila"), Sylvia Espinoza ("Espinoza"), Roxanne Garcia ("Garcia"), Alicia Casarez ("Casarez"), Alvaro Rivera ("Rivera"), Isabel Saldaña ("Saldaña"), Celina Sandoval ("Sandoval"), and Rochelle Stevens' ("Stevens") (collectively "Plaintiffs") motion for summary judgment.[1] The Court also considers its previous order granting summary judgment on liability, but reserving judgment on damages,[2] as well as Plaintiffs' supplemental evidence on damages[3] and testimony at the recent damages hearing.[4] After duly considering the record and authorities, the Court **GRANTS** summary judgment with regard to damages in the following manner.

### I. BACKGROUND

This is a collective action,[5] in which Plaintiffs allege they were not paid overtime wages in accordance with the Fair Labor Standards Act ("FLSA").[6] Plaintiffs are all licensed vocational nurses ("LVNs"), previously employed by A Healthy Living Home Health Inc. ("Healthy

---

[1] Dkt. No. 43.
[2] Dkt. No. 47.
[3] Dkt. Nos. 51–57.
[4] *See* Dkt. No. 57 (setting hearing on damages).
[5] Dkt. No. 1 pp. 4–5.
[6] *Id*. ¶ 19.

1 / 18

Living"), Hugo Santana, and Pete Cantu (collectively "Defendants") to make in-house patient visits.[7] Plaintiffs allege they consistently worked over forty hours per week, but were not paid overtime, instead receiving a fixed, per-patient visit rate.[8] Plaintiffs explain that they traveled to make patient visits, filled out paperwork at night, and attended weekly training and status conference meetings, but were never compensated for these tasks.[9] Plaintiffs further allege that Defendants' compensation practices were willful and systematic, and applied to other LVNs employed by Defendants;[10] that Defendants had previously been sued under the FSLA for the same compensation practices that are the subject of this suit;[11] and that Defendants never changed their compensation practices.[12]

Avila, Espinoza, and Garcia filed suit in federal court in December 2014.[13] The remaining Plaintiffs, including Christina Rubalcaba ("Rubalcaba"),[14] consented to join the present action during the summer of 2015.[15] The case was subsequently stayed because Healthy Living declared bankruptcy.[16] The stay was lifted in December 2016,[17] and thereafter, in January 2017, the Court permitted Defense Counsel to withdraw because Defendants refused to pay their legal fees. Since that time, Defendants have neither appeared nor defended the present action.

Plaintiffs moved for the Court to deem Defendants' statute of limitations defense waived with regard to Sandoval, because they knew she consented to join this case after the statute

---

[7] *Id.* ¶ 14.
[8] *Id.* ¶ 1.
[9] *Id.* ¶ 17.
[10] *Id.* ¶ 26.
[11] *Id.* ¶ 21.
[12] *Id.* ¶ 33.
[13] Dkt. No. 1.
[14] Dkt. No. 30.
[15] *See* Dkt. Nos. 28–33.
[16] Dkt. No. 36.
[17] Dkt. No. 38.

expired on her FLSA claim.[18] The Court granted the motion.[19] Plaintiffs also filed the instant motion for summary judgment, which the Court granted with respect to liability only, reserving judgment on damages.[20] Plaintiffs thereafter submitted supplemental evidence on damages, and the Court held a damages hearing.[21] The Court now turns to its analysis with regard to damages.

## II.     LEGAL STANDARD

The FLSA requires that a qualifying employee be paid at least one and one-half times his "regular rate" for every hour worked over forty hours.[22] When an employee is paid on a "piece rate" basis—such as here, since Plaintiffs were paid on a fixed, per-visit rate—the regular rate is calculated by adding the total earnings for the work week in question, and dividing this figure by the number of hours worked.[23] The result is the "regular rate"—a makeshift hourly rate. Since overtime is one and one-half times the regular rate, the overtime "premium" is half the regular rate, i.e., that amount due to the employee that would not be due but-for the FLSA. The premium is then multiplied by any hours worked per week over forty.

If—such as here[24]—an employer fails to keep records from which overtime can be calculated, a plaintiff's sworn affidavit may be sufficient to establish what overtime premium is due.[25] However, the Fifth Circuit has clarified that the plaintiff must provide sufficient evidence to establish the amount of overtime due as a matter of "just and reasonable inference."[26] Necessarily then, it is not enough for a plaintiff to merely put forth a conclusion as to hours

---

[18] Dkt. No. 42.
[19] Dkt. No. 46.
[20] Dkt. No. 47.
[21] *See* Dkt. Nos. 51–57.
[22] 29 U.S.C.A. § 207(a)(1) (West).
[23] 29 C.F.R. § 778.111(a).
[24] Dkt. No. 43 p. 14 (citing authorities for the proposition that affidavits are sufficient to establish overtime wages due when the defendant fails to keep adequate records).
[25] *Donovan v. Grantham*, 690 F.2d 453, 457 (5th Cir. 1982); *see also Maynor v. Dow Chemical Co.*, 671 F.Supp.2d 902, 936 (S.D. Tex. 2009) (citing *Mt. Clemens Pottery*, 328 U.S. at 687-88 (1946)).
[26] *Donovan v. Grantham*, 690 F.2d 453, 458 (5th Cir. 1982) (citing *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 688 (1946)).

worked—such would require no "inference." Similarly, it is not enough to simply put forth a conclusion as to hours worked followed by a litany of irrelevant, confused, or otherwise contradictory details—such could not possibly lead to any "just and reasonable" inference. Thus, although an employer cannot "be heard to complain that the calculations are not completely accurate because of his own failure to keep adequate records,"[27] a plaintiff cannot turn around and abuse this lack of information to bootstrap any damages figure he believes he can reasonably get away with.

Finally, if a defendant willfully violates the FLSA, the Court must assess liquidated damages. Section 216(b) of the FLSA provides that employers are not only liable for unpaid overtime premiums, but also for "an additional *equal* amount as liquidated damages."[28] The Fifth Circuit has clarified that full liquidated damages were once mandatory.[29] However, district courts now have discretion to nullify or otherwise reduce the liquidated damages penalty so long as a defendant acted in good faith and had reasonable grounds for believing its actions did not violate the FLSA.[30] Nevertheless, if a court finds that a defendant acted willfully, a finding of good faith is not possible, and thus, a court must assess full liquidated damages.[31]

### III. ANALYSIS

A. *On the whole, Plaintiffs' specific attestations concerning hours worked cannot be inferred by just and reasonable inference from the available evidence.*

The Court has already determined Plaintiffs were not paid overtime in accordance with the FLSA.[32] The only remaining question is *how much* overtime they are owed. Once calculated, these figures must be doubled as liquidated damages because the Court has found that

---

[27] *Donovan*, 690 F.2d at 457 n.3.
[28] 29 U.S.C.A. § 216(b) (West) (emphasis added).
[29] *Singer v. City of Waco, Tex.*, 324 F.3d 813, 822–823 (5th Cir. 2003).
[30] *Id.*
[31] *Id.*
[32] Dkt. No. 47 p. 11.

Defendants' FLSA violations were willful.[33] To calculate how much Plaintiffs are owed in overtime, the Court must determine the weekly hours and weekly pay for each Plaintiff. Here, as a general matter, Plaintiffs' evidence adequately supports the amount they were paid each week by just and reasonably inference. However, Plaintiffs' stated weekly hours cannot, on the whole, be inferred as a matter of just and reasonable inference from the evidence presented. Plaintiffs' stated hours must be adjusted downwards such that they properly rest upon just and reasonable inferences.

Much of Plaintiffs' evidence is infeasible *on its face*. For example, with the exception of Sandoval, Plaintiffs claim to have never taken vacation or sick days during their entire tenure working for Defendants. This is particularly troublesome for those Plaintiffs who claim to have worked seven days a week (Avila and Rivera), as well as those Plaintiffs who claim to have worked for Defendants for well over one year (Avila, Espinoza, and Rivera). Avila in particular claims to have worked seven days a week, 100 hours per week, non-stop for nearly three straight years. To make matters worse, she testified during the recent damages hearing that she had two small children during this time, rendering her already-untenable work schedule even more untenable.

Other evidence provided by Plaintiffs contradicts itself, making it difficult for the Court to make any just and reasonable inferences as to their hours. Avila attests that she worked 100 hours per week,[34] but this schedule is inconsistent with other statements she makes, the most notable being that she would spend between thirty and ninety minutes with each patient.[35] If Avila's other time-consuming tasks are subtracted from 100 hours, approximately fourteen

---

[33] Dkt. No. 47 pp. 7–8.
[34] Dkt. No. 52 ¶ 14.
[35] *Id*. ¶¶ 5–8. Avila stated during the damages hearing that a "perfect" visit might take only 30 minutes to complete.

minutes remain to visit each of her patients, not thirty to ninety minutes.[36] Something certainly smells in Denmark.[37]

In spite of Avila's express statement that she averaged "approximately one hundred (100) hours per week for Defendants,"[38] she also provides details within her supplemental declaration from which the Court must infer that she worked at least (and based strictly on these details, probably more than) 131.5 hours per week.[39] This latter figure is both outrageous and unavoidably inconsistent with Avila's 100-hour statement,[40] thus simultaneously drawing *both* figures into doubt. At best, Avila appears to have no clear idea how many hours she worked per week, and at worst, greatly exaggerates the details in her supplemental declaration—not thinking anybody would take the time to add them up.

Plaintiffs Espinoza and Casarez's evidence is plagued with the same internal discrepancies. Espinoza claims to have "worked approximately ninety (90) hours per week for Defendants."[41] However, the details in her supplemental declaration necessitate that she worked at least 101 hours per week—an 11 hour weekly difference.[42] Similarly, Casarez claims to have averaged 85 hours per week,[43] but the details in her supplemental declaration necessitate that she

---

[36] *See* Dkt. No. 52. Avila claims to have worked 87.3 hours apart from her actual patient visits (45.5 hours travel, 31.5 hours working at home, 4.5 hours of conference, 4 hours of corrections at the office, and 1.8 hours of training). This only leaves 12.7 hours left in Avila's work week to complete patient visits. When 12.7 hours is divided by Avila's 55 weekly visits, this only leaves .23 of one hour per visit (13.85 minutes per visit).
[37] *See* http://www.shakespeare-online.com/quickquotes/quickquotehamletdenmark.html.
[38] Dkt. No. 52 ¶ 14.
[39] *See* Dkt. No. 57 p. 4.
[40] Dkt. No. 52 ¶ 14.
[41] Dkt. No. 43-2 ¶ 4.
[42] *See* Dkt. No. 53 ¶ 4 (from which the Court can infer Espinoza worked 40 hours per week on visits); *Id*. ¶ 3 (from which the Court can infer Espinoza spent 27 hours traveling); *Id*. ¶¶ 7–8 (from which the Court can infer Espinoza spent approximately 27 hours and 52.5 minutes per week completing notes and corrections); *Id*. ¶¶ 5–6 (from which the Court can infer Espinoza spent 6.5 hours attending training and conferences). Taken together, this amounts to approximately 101 hours per week.
[43] Dkt. No. 43-4 ¶¶ 2 & 4 (indicating Casarez worked every other weekend, and that she worked 75 hours per week when she did not work weekends, and 95 hours per week when she did work weekends, thus averaging out to 85 hours per week).

worked at least 101 hours per week—a 16 hour weekly difference.[44] In sum, certain of Plaintiffs' evidence with regard to hours worked contain sever internal inconsistencies.

Finally, at least three Plaintiffs (Saldaña, Sandoval, and Stevens) have submitted conclusory evidence concerning their hours.[45] Consequently, no inferences at all (much less just and reasonable ones) can be drawn. For reasons that will become clear, Stevens' evidence is nevertheless the most trustworthy of the bunch. In sum, certain of Plaintiffs' evidence do not permit any inference whatsoever with regard to hours worked.

The Court could go on, but the point remains the same: Plaintiffs' stated hours are generally: (1) preposterous, (2) contradicted by their other statements, or (3) not supported with meaningful, non-preposterous, non-contradicted facts from which the Court can reasonably infer the total number of stated hours. Plaintiffs' stated hours must be reduced to a point where they *can* be supported by a just and reasonable inference from the available evidence. Thus, the Court is forced to devise a methodology capable of doing this.

B. *The Court's methodology for determining hours worked*

Plaintiffs' weekly hours can be divided into two categories. The first category includes any hours worked at home completing notes and corrections. The second category includes any hours worked away from home, including patient visits, traveling, training, and conferences.

---

[44] *See* Dkt. No. 55 ¶ 5 (indicating visits took at least 40 minutes and usually longer); Dkt. No. 43-4 ¶ 3 (from which the Court can infer Casarez visited an average of 53.75 patients per week); *Id*. ¶ 4 (from which the Court can infer Casarez spent 30 hours per week doing notes and corrections); Dkt. No. 55 ¶ 4 (from which the Court can infer Casarez spent 24 hours per week traveling between patient's homes); *Id*. ¶ 8 (from which the Court can infer Casarez spent approximately 6 hours per week doing corrections at Defendants' office); *Id*. ¶¶ 6–7 (from which the Court can infer Casarez spent five hours per week at training and conference meetings). Taken together, visits are claimed to have taken at least 35.83 hours per week (40 minutes multiplied by 53.75 visits divided by 60 minutes to get hour units = 35.83 hours), which added to 30 hours of notes and corrections, 24 hours of traveling, 6 more hours of corrections at Defendants' office, and 5 hours of training and conferences, equals 100.83 hours per week.
[44] Dkt. No. 43-4 ¶¶ 2 & 4 (indicating Casarez worked every other weekend, and that she worked seventy-five hours per week when she did not work weekends, and ninety-five hours per week when she did work weekends).
[45] *See* Dkt. No. 43-6 ¶ 3 (concluding without explanation that Saldaña averaged 75 hours of work per week); Dkt. No. 43-7 ¶ 4 (same, except landing on 65 hours per week); Dkt. No. 43-8 (same, except landing on 75 hours per week).

Every hour of the work week for each Plaintiff falls into one of these two categories. Total weekly hours for each Plaintiff can thus be determined by calculating how many weekly hours fit into each category, and then adding those categories together, arriving at each Plaintiff's total weekly hours.

The *first* category—hours worked at home—will be determined using Stevens' stated hours as a baseline. Stevens is the only Plaintiff who provides credible evidence with regard to the hours she worked at home on notes and corrections.[46] Of course, the amount of time spent at home on notes and corrections will roughly correlate to the number[47] of visits completed since the notes and corrections concern those visits. Thus, the Court takes the number of hours Stevens claims to have spent per week completing notes and corrections at home (18), and divides this figure by the number of visits Stevens claims to have completed each week (65). The Court thus derives the "Stevens Quotient"—.28[48]—which roughly represents the amount of time any particular Plaintiff spent on notes and corrections at home per visit they claimed to have made. The Stevens Quotient will be multiplied by the stated number of weekly visits to arrive at the number of hours worked at home per week for each Plaintiff.

The *second* category—hours worked away from home—will be determined using Avila and Espinoza's testimony at the damages hearing. Avila stated that generally, she spent 9.67 hours per day working away from home.[49] Similarly, Espinoza stated that on average, she spent

---

[46] Stevens' claims to have spent substantially less time completing notes and corrections in relation to each visit she made, as compared to the other Plaintiffs.
[47] No doubt the time spent on notes and corrections will also turn on the *types* of visits completed, not just the number. However, Plaintiffs have failed to supply sufficient evidence for the Court to make just and reasonable inferences with regard to any such correlation value.
[48] Stevens provides evidence that she spend eighteen hours on notes and corrections each week, and made sixty-five patient visits. Thus, the Court divides eighteen by sixty-five to arrive at .2769, rounded to .28—the portion of one hour (16.8 minutes) that Stevens spent on notes and corrections for each patient visit she made.
[49] Avila testified that her work outside of her home began at 7:50 a.m. and ended at 5:30 p.m.

12.5 hours per day working away from home.⁵⁰ When these hours are multiplied by the days per week,⁵¹ and divided by the number of respective visits made per week, the Court derives an Avila Quotient (1.05) and an Espinoza Quotient (1.25), and averages these quotients to arrive at the "Avila-Espinoza Quotient" of 1.15.⁵² This number roughly represents how many hours each visit took, *and also accounts for all travel, training, and conferences attended*.⁵³ The Avila-Espinoza Quotient will be multiplied by the stated number of weekly visits to arrive at the total number of hours worked away from home each week for each Plaintiff.

These formulas are meant to constitute a check on conclusory hours that might be inflated. In some cases, the formulas result in more hours per week than the particular Plaintiff states he/she worked per week or otherwise requests compensation for in the summary judgment motion. In these instances, the formulas will not be applied, and the specific requests will be honored. With all this in mind, the Court turns to its analysis of each Plaintiff.

C. *Application of the Court's methodology to each Plaintiff*

i. *Avila*

First, Avila's attestation that she worked seven days per week,⁵⁴ 100 hours per week,⁵⁵ with two young children,⁵⁶ without any time off for vacation or sick leave,⁵⁷ for two years and ten months,⁵⁸ is patently untenable. These attestations cannot be concluded as a matter of just

---

⁵⁰ Espinoza testified that her work outside of her home began at 7:00 a.m. and ended at 7:30 p.m.
⁵¹ For reasons that will soon become apparent, Avila worked six days per week for purposes of this calculation, rather than seven.
⁵² $1.05 + 1.25 \div 2 = 1.15$
⁵³ The Court notes that each Plaintiff presumptively attended the same training sessions and conferences for the same periods of time, and thus there is little if any meaningful variance among them with respect to these categories of work hours. Although there was no doubt some variance in geography covered by each plaintiff for their travel, insufficient facts have been provided to the Court to justly and reasonably infer what this variance might be.
⁵⁴ Dkt. No. 43-1 ¶ 2.
⁵⁵ *Id*. ¶ 4.
⁵⁶ Avila stated this during the damages hearing.
⁵⁷ Dkt. No. 43-1 ¶ 2.
⁵⁸ *Id*.

and reasonable inference based upon the available evidence.[59] Avila claims to have completed fifty-five visits per week.[60] Multiplied by the Stevens Quotient—.28—the Court arrives at 15.4 hours spent working at home per week. Furthermore, Avila testified that she worked 9.67 hours away from home each day,[61] which over a six-day work week, totals 58.02 hours. Thus, in total, the Court finds Avila worked 73.42 hours per week.[62]

Avila attests that she grossed $1,375.00 per week.[63] Thus, the Court derives Avila's regular rate: $18.73.[64] Consequently, Avila's overtime premium is one-half this amount: $9.37. Multiplied by Avila's weekly overtime hours (33.42), Avila's weekly overtime premium due is $313.15. Multiplied by the total number of full weeks Avila claims to have worked for Defendants (144),[65] Avila's total overtime premium due is $45,093.60. However, because Defendants' FLSA violation was willful, this figure must be doubled under § 215(b) of the FLSA to **$90,187.20**.

    ii.   *Espinoza*[66]

Espinoza claims she averaged 60 visits per week.[67] Multiplied by the Stevens Quotient—.28—the court arrives at 16.8 hours working at home per week. Furthermore, when 60 visits are multiplied by the Avila-Espinoza Quotient, the Court arrives at 69 hours worked outside the house each week. Thus, in total, the Court finds Espinoza worked 85.8 hours per week.

---

[59] The Court presumes that on average, Avila worked six days per week. This explains why only 6 workdays were countenances when calculating the Avila Quotient, rather than 7.
[60] Dkt. No. 43-1 ¶ 3.
[61] Avila testified that her work outside of her home began at 7:50 a.m. and ended at 5:30 p.m.
[62] 9.67 hours per day multiplied by 6 days in a week is 58.
[63] Dkt. No. 43-1 ¶ 3.
[64] $1,375.00 ÷ 73.42 hours = $18.727 (rounded up to $18.73).
[65] Dkt. No. 43 pp. 14–15.
[66] *See* Dkt. No. 43-2 ¶ 4 (claiming she worked 90 hours per week on average); *see also* Dkt. No. 53 ¶ 8 (same); Dkt. No. 43 p. 15 (requesting overtime based upon 90 hours per week). As will be shown, application of the Stevens Quotient and Avila-Espinoza Quotient is appropriate here, as it would result in fewer hours.
[67] Dkt. No. 53 ¶ 2 (claiming she worked every other weekend); Dkt. No. 43-2 ¶ 3 (claiming she averaged 55 visits on weeks she did not work on the weekends, and 65 visits on weeks she did work the weekends).

Espinoza attests that she grossed $1,600.00 per week.[68] Thus, the Court derives Espinoza's regular rate: $18.65.[69] Consequently, her overtime premium is one-half this amount: $9.33. Multiplied by her weekly overtime hours (45.8), Espinoza's weekly overtime premium due is $427.31. Multiplied by the total number of full weeks she claims to have worked for Defendants (140),[70] Espinoza's total overtime premium due is $59,823.40. However, because Defendants' FLSA violation was willful, this figure must be doubled under § 215(b) of the FLSA to **$119,646.80**.

### iii.  Garcia[71]

Garcia claims she completed 50 visits on average each week.[72] Multiplied by the Stevens Quotient—.28—the Court arrives at 14 hours spent working at home per week. Furthermore, when 50 visits are multiplied by the Avila-Espinoza Quotient, the Court arrives at 57.5 hours worked outside the house each week. Thus, in total, Garcia worked 71.5 hours per week.

Garcia attests that she grossed $1,300.00 per week.[73] Thus, the Court derives her regular rate: $18.18.[74] Consequently, her overtime premium is one-half this amount: $9.09. Multiplied by her weekly overtime hours (31.5), Garcia's weekly overtime premium due is $286.34. Multiplied by the total number of full weeks she claims to have worked for Defendants (39),[75] Garcia's total overtime premium due is $11,167.26. However, because Defendants' FLSA violation was willful, this figure must be doubled under § 215(b) of the FLSA to **$22,334.52**.

---

[68] Dkt. No. 43-2 ¶ 3.
[69] $1,600.00 ÷ 85.8 = $18.648 (rounded up to $18.64).
[70] Dkt. No. 43 p. 15.
[71] *See* Dkt. No. 54 ¶ 7 (claiming she worked 95 hours per week on average); *see also* Dkt. No. 43 p. 16 (stating she worked 85 hours per week for purposes of determining overtime compensation). As will be shown, application of the Stevens Quotient and Avila-Espinoza Quotient is appropriate here, as it would result in fewer hours.
[72] Dkt. No. 43-3 ¶ 3.
[73] *Id*.
[74] $1,300.00 ÷ 71.5 hours = $18.181 (rounded down to $18.18).
[75] Dkt. No. 43-4 ¶ 4.

### iv. Casarez

Casarez claims she worked 75 hours per week for purposes of determining overtime compensation.[76] This is 1.86 hours less than would result from applying the Stevens and Avila-Espinoza Quotients.[77] Thus, these Quotients will not be applied. Because Casarez's 75 requested hours are less than the result of applying the Quotients, the Court can reasonably and justly infer that this number is within a reasonable range of accuracy.

Casarez also effectively attests that she grossed an average of $950.00 per week.[78] Thus, the Court derives her regular rate: $12.67.[79] Consequently, her overtime premium is one-half this amount: $6.34. Multiplied by her weekly overtime hours (35), Casarez's weekly overtime premium due is $221.90. Multiplied by the total number of full weeks she claims to have worked for Defendants (45),[80] Casarez's total overtime premium due is $9,985.50. However, because Defendants' FLSA violation was willful, this figure must be doubled under § 215(b) of the FLSA to **$19,971.00**.

### v. Rivera[81]

Rivera claims he completed 80 visits on average each week.[82] Multiplied by the Stevens Quotient—.28—the Court arrives at 22.4 hours spent working at home per week. However, the Avila-Espinoza Quotient cannot properly be applied to Rivera to derive total hours worked

---

[76] Dkt. No. 43 p. 17.
[77] Casarez claims to have completed 53.75 visits on average each week. Multiplied by the Stevens Quotient—.28—the Court arrives at 15.05 hours spent working at home per week. Furthermore, when 53.75 visits are multiplied by the Avila-Espinoza Quotient—1.15—the Court arrives at 61.81 hours worked outside the house each week. Combined, this results in 76.86 hours per week.
[78] *See* Dkt. No. 43-4 ¶ 3.
[79] $950.00 ÷ 75 hours = $12.666 (rounded up to $12.67).
[80] Dkt. No. 43 p. 17.
[81] *See* Dkt. No. 56 ¶ 14 (effectively claiming he worked 92.5 hours per week on average); *see also* Dkt. No. 43 p. 17 (stating he worked 90 hours per week for purposes of determining overtime compensation). As will be shown, Application of the Stevens is appropriate in combination with another method employed by the Court (which is based upon Rivera's own statements), because it ultimately reduces to a figure smaller than 90 hours worked per week.
[82] Dkt. No. 43-5 ¶ 3.

outside the home, because Rivera's geographic travel radius was *extremely* small. Rivera attests that approximately 80% of his patient visits were in virtually the same geographic location—Donna, Texas.[83] Because Defendants' office was also located in Donna, negligible travel time was required to attend meetings or pick up supplies.[84] The remaining 20% of Rivera's patients lived reasonably close to Donna, in either Pharr, McAllen, Edinburg, or otherwise within Hidalgo County.[85] As a result, Rivera's total work hours away from home were comprised of very few travel hours. Thus, directly applying the Avila-Espinoza Quotient would artificially inflate Rivera's hours worked away from home.

However, based upon evidence submitted by Plaintiffs generally, a just and reasonable inference can be made that on average each visit took approximately 41 minutes.[86] Multiplied by Rivera's stated number of weekly visits (80), and divided by 60 to get hourly units, this amounts to 54.67 hours per week. Additionally, Rivera attests (consistent with the other evidence pertinent in this case) that he spent approximately 3.5 hours per week attending training and conferences.[87] Thus, Rivera worked approximately 58.17 hours away from home.

The Court will not countenance Rivera's travel time for two reasons.[88] First, Rivera has not provided *any* meaningful evidence with regard to this figure, except that his travel was

---

[83] Dkt. No. 56 ¶ 6.
[84] *Id.*
[85] *Id.*
[86] Avila testified that visits could take as little as 30 minutes. Dkt. No. 56 ¶¶ 7–11 (Rivera's supplemental declaration indicating that visits would generally take 30–45 minutes to complete); Dkt. No. 52 ¶¶ 5–8 (Avila's supplemental declaration indicating that visits often took 45 minutes to complete); Dkt. No. 53 ¶ 4 (Espinoza's supplemental declaration indicating visits might take between 40 minutes and 1 hour to complete); Dkt. No. 54 ¶ 4 (Garcia's supplemental declaration indicating visits would take 30–45 minutes to complete, and sometimes up to 1 hour).
[87] Dkt. No. 56 ¶¶ 12–13.
[88] No doubt Rivera had travel time. However, for reasons that will soon be clear, adding any to the numbers the Court has started with would have implications that themselves would be patently non-credible. Thus, the Court is not ignoring Rivera's travel time. Rather, the Court is not specifically taking a discreet amount of time and designating it "travel time."

minimal.[89] Second, Rivera states that he worked part time for another employer *on top* of all the hours he worked for Defendants.[90] Adding any travel time to 58.17 hours would, in combination with 22.4 hours worked at home per week and another part time job, result in a patently untenable work schedule (at least 100 hours per week for 1 year, 5 months straight). Thus, the Court finds Rivera worked 58.17 hours away from home each week for Defendants. In sum, based upon the available credible evidence, the Court can only reasonably and justifiably infer that Rivera worked 80.57 hours each week for Defendants.

Rivera attests that he grossed $2,400.00 per week. This cannot be concluded as a matter of just and reasonable inference because Rivera also states that he grossed $25.00 per visit and made approximately 80 visits per week—$2,000.00 total per week. Rivera's 2014 tax statement suggests the $2,000.00 per-week figure is more accurate than the $2,400.00 per-week figure, indicating that Rivera grossed $40,613.00 while working for Defendants in 2014.[91] Rivera's own statements indicate this sum was earned over a five months work period (21 weeks in total).[92] If Rivera made $2,400.00 per week in 2014, then he appears to have underreported his income from Defendants by $9,787.00. However, if Rivera made $2,000.00 per week, then it would appear he only underreported his 2014 income from Defendants by $1,387.00. In sum, the credible evidence indicates Rivera grossed $2,000.00 per week, rather than $2,400.00 per week.

Based upon $2,000.00 of gross income per week, the Court derives Rivera's regular rate: $24.82.[93] Consequently, his overtime premium is one-half this amount: $12.41. Multiplied by his weekly overtime hours (40.57), Rivera's weekly overtime premium due is $503.47. Multiplied

---

[89] *See* Dkt. No. 56 ¶ 6.
[90] *Id*. ¶ 4.
[91] Dkt. No. 56 p. 23 (under "wages, tips, and other compensation").
[92] Dkt. No. 43-5 ¶ 2.
[93] $2,000.00 ÷ 80.57 hours = $ 24.823 (rounded down to $24.82).

by the total number of full weeks he claims to have worked for Defendants (73),[94] Rivera's total overtime premium due is $36,753.31. However, because Defendants' FLSA violation was willful, this figure must be doubled under § 215(b) of the FLSA to **$73,506.52**.

### vi. Saldaña[95]

Saldaña claims she completed 45 visits on average each week.[96] Multiplied by the Stevens Quotient—.28—the Court arrives at 12.6 hours spent working at home per week. Furthermore, when 45 visits are multiplied by the Avila-Espinoza Quotient—1.15—the Court arrives at 51.75 hours worked outside the house each week. Thus, in total, Saldaña worked 64.35 hours per week.

Saldaña also attests that she grossed $1,100.00 per week.[97] Thus, the Court derives her regular rate: $17.09.[98] Consequently, her overtime premium is one-half this amount: $8.55. Multiplied by her weekly overtime hours (24.35), Saldaña's weekly overtime premium due is $208.19. Multiplied by the total number of full weeks she claims to have worked for Defendants (12),[99] Saldaña's total overtime premium due is $2,498.28. However, because Defendants' FLSA violation was willful, this figure must be doubled under § 215(b) of the FLSA to **$4,996.56**.

---

[94] Dkt. No. 43 p. 17.
[95] *See* Dkt. No. 43-6 ¶ 4 (claiming she worked 75 hours per week on average); *see also* Dkt. No. 43 p. 18 (stating she worked 75 hours per week for purposes of determining overtime compensation). As will be shown, application of the Stevens and Avila-Espinoza Quotients is appropriate because it will result in fewer hours.
[96] *Id.* ¶ 3. Saldaña claims to have completed even more visits when she worked weekends, but provides absolutely no reference point as to how many more visits she completed on weekends. Thus, the Court cannot conclude as a matter of just and reasonable inference that Saldaña completed any more than 45 visits per week.
[97] *Id.*
[98] $1,100.00 ÷ 64.35 hours = $17.094 (rounded down to $17.09).
[99] Dkt. No. 43 p. 18.

### vii. Sandoval[100]

Sandoval claims she completed 45 visits on average each week.[101] Multiplied by the Stevens Quotient—.28—the Court arrives at 12.6 hours spent working at home per week. Furthermore, when 45 visits are multiplied by the Avila-Espinoza Quotient—1.15—the Court arrives at 51.75 hours worked outside the house each week. Thus, in total, Sandoval worked 64.35 hours per week.

Sandoval also attests that she grossed $990.00 per week.[102] Thus, the Court derives her regular rate: $15.38.[103] Consequently, her overtime premium is one-half this amount: $7.69. Multiplied by her weekly overtime hours (24.35), Sandoval's weekly overtime premium due is $187.25. Multiplied by the total number of full weeks the evidence supports that she worked for Defendants (22),[104] Sandoval's total overtime premium due is $4,119.50. However, because Defendants' FLSA violation was willful, this figure must be doubled under § 215(b) of the FLSA to **$8,239.00**.

### viii. Stevens

Stevens attests that she worked 75 hours per week total,[105] and there is no reason to doubt this figure. Her claimed weekly at-home hours (18) are the very basis for the Stevens Quotient. As for hours worked away from home, application of the Avila-Espinoza Quotient is unnecessary since it would result in a number significantly greater than what Stevens is

---

[100] *See* Dkt. No. 43-7 ¶ 4 (claiming she worked 65 hours per week on average); *see also* Dkt. No. 43 p. 18 (stating she worked 65 hours per week for purposes of determining overtime compensation). As will be shown, application of the Stevens and Avila-Espinoza Quotients is appropriate because it will result in (slightly) fewer hours.
[101] Dkt. No. 43-7 ¶ 3.
[102] *Id*.
[103] $990.00 ÷ 64.35 hours = $15.384 (rounded down to $15.38).
[104] Dkt. No. 43-7 p. 1. Sandoval attests that she worked for Defendants from February through the first week of July 2012—a total of 22 weeks. Sandoval also claims to have taken one week of vacation during the second week of July 2012, but there is no evidentiary support in the record that this was *paid* vacation. Thus, although Sandoval requests 23 weeks of work in her summary judgment motion, the evidence itself only supports 22.
[105] Dkt. No. 43-8 ¶ 4.

implicitly attesting to (57).[106] Thus, the Court can reasonably and justifiably infer that Stevens worked 75 hours per week for Defendants.

Stevens also attests that she grossed $1,625.00 per week.[107] Thus, the Court derives her regular rate: $21.67.[108] Consequently, her overtime premium is one-half this amount: $10.84. Multiplied by her weekly overtime hours (35), Stevens' weekly overtime premium due is $379.40. Multiplied by the total number of full weeks she claims to have worked for Defendants (17),[109] Stevens' total overtime premium due is $6,449.80. However, because Defendants' FLSA violation was willful, this figure must be doubled under § 215(b) of the FLSA to **$12,899.60**.

D. *Fees and expenses*

In their motion for summary judgment, Plaintiffs indicate they will be seeking post-judgment attorneys' fees and expenses under the FLSA. Indeed, fee awards and costs are mandatory under the FLSA for prevailing plaintiffs.[110] Moreover, it appears assessment of fees and costs may properly be granted in the FLSA context upon a sufficient Rule 54 motion.[111] The Court thus reserves judgment until proper motion, and in any event will wait until Plaintiffs' counsel apprises the Court of how Rubalcaba plains to proceed in this matter.

---

[106] By stating that she worked 18 hours at home per week and a total of 75 hours per week, Stevens is implicitly stating that she worked 57 hours away from home each week. Application of the Avila-Espinoza Quotient to Stevens' visits (1.15 multiplied by 65 visits = 74.75 hours worked away from home, plus 18 hours worked at home = *92.75* hours, rather than Stevens' claimed 75 hours).
[107] Dkt. No. 43-8 ¶ 3.
[108] $1,625.00 ÷ 75 hours = $21.666 (rounded up to $21.67).
[109] Dkt. No. 43 p. 19.
[110] *See* 29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."); *see also e.g.*, *Hilton v. Executive Self Storage Associates, Inc.*, 2009 WL 1750121, at *8 (S.D. Tex. June 18, 2009).
[111] *Id*.

## IV. HOLDING

In accordance with the terms of this order, Plaintiffs' motion for summary judgment with regard to damages is hereby **GRANTED**.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 3rd day of November, 2017.

_____
Micaela Alvarez
United States District Judge